NORWOOD, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–508–CR.  Argued October 5, 1976.—*
*Decided November 16, 1976.*
(Also reported in 246 N. W. 2d 801.)

For the plaintiff in error there were briefs by *Howard B. Eisenberg,* state public defender, and *Jack E. Schairer,* assistant state public defender, and oral argument by *Mr. Schairer.*

For the defendant in error the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

CONNOR T. HANSEN, J. The defendant is alleged to have driven an automobile into the side of another automobile at a time when Jimmie (James) Johnson, the driver of the second car was in the process of entering the car. As a result of the contact between the two cars, Johnson was pinned between the door and the body frame of the car he was entering.

Robbie Queary, a witness for the state, testified that she was at a party at 2124 West Lloyd street in Milwaukee on the morning of October 7, 1972. It was a party by invitation. Johnson was invited to the party. The defendant was not invited. Queary observed the defendant at the party and also saw Johnson enter the premises. The defendant was asked to leave the party; a scuffle then broke out between the defendant and others at the party. She observed the defendant leave the party and run to his car. Johnson had already left and was getting into his car. Queary observed the defendant run his car into Johnson's car three consecutive times, pinning Johnson in the door, and then observed the defendant leave.

Johnson testified that when he arrived at the party a fight involving the defendant was taking place. Johnson, upon observing the fight, left the house to return to the car which he and his nephew had driven to the party. Upon reaching the car, Johnson opened the door on the driver's side and stood there lighting a cigarette. He remembers getting hit once and then remembers nothing further until he woke up in the hospital three or four days later. Johnson testified he had never seen the defendant before October 7, 1972, and that he had not fought with him at the party.

The third and final witness for the state was Adam Wojak, patrolman, Milwaukee Police Department. He testified that he responded to a call at 2124 West Lloyd street and upon arrival observed a green Buick on the sidewalk. The car had been struck on the driver's side

and Johnson, who appeared to be unconscious, was trapped between the door and the door post. Wojak called an ambulance; Johnson was cut from the vehicle and taken to the hospital. Later on that morning, October 7, 1972, he observed the car driven by the defendant. The front end was damaged on both sides and there were numerous splatters of blood on the hood.

Wojak further testified that he saw defendant later that morning at approximately 10:30 a.m. at the third district police station where defendant turned himself in; that he advised the defendant of his constitutional rights; and that the defendant stated that:

". . . he did hit Mr. Johnson and his car, but he had only hit him once because he thought that Mr. Johnson was getting a gun from his vehicle and he wanted to stop him."

Wojak testified that two days later, on October 9, 1972, in the district attorney's office, after again being advised of his constitutional rights, the defendant stated:

". . . All right, I hit him 3 times. I wanted to kill him for beating me up."

Norwood, the defendant, testified in his own behalf and as the only witness for the defense. He testified that he was thirty-five years old, had a limited grade-school education, was epileptic and had heart trouble. He was at the Lloyd street party, remembered getting jumped on and hit and the next thing he remembered was being home. He denied telling the officers he hit Johnson's car, but stated that he told them he had hit something because his car was bent. Norwood testified that he did not know Johnson, wasn't mad at him, did not remember striking him, and that he did not believe Johnson's testimony. He denied making the statement to Officer Wojak on October 7, 1972, and further denied making the latter statement in the office of the district attorney.

The defendant was arrested October 7, 1972. His trial was held August 26, 1974. Additional facts will be set forth when considering the issues presented for review, which are:

1. Was the defendant denied his right to a speedy trial?

2. Did the defendant knowingly and intelligently waive his right to a jury trial?

3. Were the two oral statements given by the defendant properly admitted into evidence at trial?

*SPEEDY TRIAL.*

The defendant claims that he was denied the right to a speedy trial as guaranteed by the sixth amendment to the constitution of the United States and art. I, sec. 7 of the Wisconsin Constitution. *Klopfer v. State of North Carolina* (1967), 386 U.S. 213, 87 Sup. Ct. 988, 18 L. Ed.2d 1; *State ex rel. Fredenberg v. Byrne* (1963), 20 Wis.2d 504, 123 N.W.2d 305.

It is, therefore, necessary to set forth a chronology of the events commencing with the commission of the alleged crime and culminating with the defendant's conviction. Those events are summarized as follows:

*October 7, 1972:* Commission of the alleged crime of attempted first-degree murder at approximately 3:25 a.m. At approximately 10:30 a.m. the defendant turns himself in to the third district police station, makes a statement implicating himself to Officers Schoner and Wojak, and is placed in custody.

*October 9, 1972:* The defendant appears before the district attorney and makes a further implicating statement. The complaint is sworn out against the defendant. The defendant, represented by Attorney Marola, makes an initial appearance in branch 12 of the circuit court. Judge COFFEY finds the complaint in order, finds probable cause to hold the defendant for further pro-

ceedings and sets bail. On the defendant's motion, the case is adjourned for preliminary examination to October 18, 1972. The case is assigned by lot to branch 4 of the county court.

*October 18, 1972:* Preliminary hearing held in branch 4 of the county court. Probable cause is found and the defendant bound over to circuit court for trial.

*October 27, 1972:* Information dated October 25, 1972, is filed in circuit court.

*October 31, 1972:* Arraignment in branch 11 of the circuit court. The defendant waives reading of the information and pleads not guilty. After denial of defense motions to reduce or modify bail, the defendant demands a speedy trial. Judge STEFFE adjourns the case to January 29, 1973, for jury trial.

*December 5, 1972:* The court permits Attorney Marola to withdraw and appoints Attorney Styler to represent the defendant. Motions to reduce or modify bail are denied.

*January 15, 1973:* Case transferred by Chief Judge L. J. FOLEY to branch 14 of the circuit court for trial. The defendant appears in branch 14 of the circuit court and requests a physical and mental examination relative to his ability to stand trial. Judge L. J. FOLEY finds probable cause to believe that the defendant may be suffering from mental disease or defect, and orders that the defendant be sent to Central State Hospital for examination for a period not to exceed 60 days.

*February 21, 1973:* Central State Hospital report on the defendant dated February 20, 1973, received and filed with the circuit court.

*February 26, 1973:* Judge L. J. FOLEY, upon reviewing the Central State Hospital report, determines that further medical testimony is necessary and orders Dr. James Hurley to examine the report and the defendant. The case is continued to March 8, 1973, for hearing on mental competency.

*March 8, 1973:* Hearing held in branch 14 on the competency of the defendant to stand trial. Dr. Hurley testifies. Judge L. J. FOLEY finds the defendant not competent to participate in his own defense. The defendant is committed to Central State Hospital pursuant to sec. 971.-14(5), Stats. All proceedings are stayed until such time as the defendant is found competent.

*September 26, 1973:* Court allows Attorney Styler to withdraw and appoints Attorney Goulee to represent the defendant.

*October 5, 1973:* The defendant files *pro se* motions for interpreter and for dimissal because of lack of speedy trial. Judge L. J. FOLEY sets hearing on those motions and hearing for receipt of further Central State Hospital reports for November 16, 1973.

*November 16, 1973:* Acting Chief Judge CANNON transfers case to Judge SULLIVAN. District attorney requests adjournment of case pending a supreme court decision (*State ex rel. Haskins v. Dodge County Court* (1974), 62 Wis.2d 250, 214 N.W.2d 575), which will affect this case. The defendant does not object. Judge SULLIVAN adjourns proceedings to December 7, 1973.

*December 7, 1973:* All parties agree to further adjournment of above proceedings to January 15, 1974.

*March 19, 1974:* Judge SULLIVAN hears the competency issue, finds the defendant competent to stand trial. The defendant requests assignment back to Judge L. J. FOLEY's court to hear the previous *pro se* motions. Judge SULLIVAN advises that he could probably give a trial date in early April, but upon consultation with Acting Chief Judge O'CONNELL, agrees to send the case back to Judge L. J. FOLEY.

*March 20, 1974:* Case referred from Judge L. J. FOLEY to Judge J. F. FOLEY, branch 7 of the circuit court. Judge J. F. FOLEY sets March 26, 1974, for bail evaluation, April 3, 1974, for motion hearing, and June 10, 1974, for jury trial.

*March 26, 1974:* Due to jury trial in progress, Judge J. F. FOLEY sets bail evaluation hearing over to April 1, 1974.

*April 1, 1974:* Judge J. F. FOLEY hears and denies bail reduction motion. The defendant claims to have made an oral demand for speedy trial at this hearing but the record does not reflect such a demand.

*April 9, 1974:* The defendant makes a demand for discovery and inspection.

*April 11, 1974:* Suppression of evidence motion scheduled for hearing before Judge J. F. FOLEY. Defense counsel engaged in another trial. Suppression hearing adjourned to April 18, 1974.

*April 18, 1974:* Judge J. F. FOLEY hears and denies suppression of evidence motion. The defendant moves for further examination as to competency to stand trial. Judge J. F. FOLEY appoints Doctors Weber and Studley to examine the defendant.

*May 10, 1974:* The defendant requests the court to examine its calendar to determine whether the jury trial will go on June 10, 1974. Judge J. F. FOLEY finds that he has three murder trials between May 10, 1974, and June 30, 1974. The defendant demands speedy trial and requests reassignment back to branch 14 or to the court administrator. Judge J. F. FOLEY grants the request and refers the case to branch 14.

*May 16, 1974:* Branch 14 refers case back to Judge J. F. FOLEY. Judge J. F. FOLEY refers case to court administrator for reassignment.

*May 30, 1974:* Court administrator assigns case to branch 11 of the circuit court.

*June 10, 1974:* The defendant requests a substitution of judges. Judge SERAPHIM grants the request and transfers the case back to the court administrator for reassignment. Case reassigned to branch 12 of the circuit court. Judge COFFEY, branch 12, orders the case transferred

to branch 4 of the circuit court, Judge CANNON, for trial.

*June 17, 1974:* Pursuant to the defendant's request, Judge CANNON sets trial for July 17, 1974, and sets July 3, 1974, as date to receive medical reports from Doctors Weber and Studley.

*July 3, 1974:* Reports received from Doctors Weber and Studley. Trial date still set for July 17, 1974.

*July 17, 1974:* Due to congested court calendar, Judge CANNON continues case to July 25, 1974, for trial.

*July 25, 1974:* Due to murder trial in progress, Judge CANNON continues case to August 26, 1974, for trial. The defendant's motion for release from bail/incarceration because trial not set within 90 days from May 10, 1974, demand for speedy trial denied.

*August 26, 1974:* Trial held branch 4, circuit court. Defendant convicted of attempted first-degree murder and sentenced to an indeterminate term of imprisonment not to exceed seven years.

As most recently stated in *Beckett v. State* (1976), 73 Wis.2d 345, 243 N.W.2d 472, the principles enunciated in *Barker v. Wingo* (1972), 407 U.S. 514, 92 Sup. Ct. 2182, 33 L. Ed.2d 101, and recognized by this court in *Day v. State* (1973), 61 Wis.2d 236, 212 N.W.2d 489, and cases subsequent to the *Barker* decision are dispositive of the question of whether or not a defendant has been denied the right to a speedy trial.[1]

In *Barker*, the United States Supreme Court considered a situation wherein a five-year time period elapsed between the defendant's arrest and trial. The court there found such a delay to be presumptively prejudicial and promulgated a balancing test to be applied on

[1] *State v. Russo* (1975), 70 Wis.2d 169, 233 N.W.2d 485; *Foster v. State* (1975), 70 Wis.2d 12, 233 N.W.2d 411; *State v. Shears* (1975), 68 Wis.2d 217, 229 N.W.2d 103; *Hadley v. State* (1975), 66 Wis.2d 350, 225 N.W.2d 461; and *Watson v. State* (1974), 64 Wis.2d 264, 219 N.W.2d 398.

an ad hoc basis in such cases where speedy trial was in issue. The court identified four factors which should be assessed in determining whether a particular defendant had been deprived of the right to speedy trial: (1) Length of delay; (2) reason for delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker, supra,* p. 530.

■ While all four factors were important, the *Barker* court held that the threshold inquiry in speedy trial cases must always concern the length of delay. Until it was determined that the length of delay was presumptively prejudicial, no resort could be had to inquiring into the other factors. The court stated at pp. 530, 531:

"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. *Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case.*" (Emphasis added.)

*Barker* held that, absent legislative direction, no specific time period would be adopted as a condition precedent to the application of the balancing test. In adopting the test in *Day, supra,* p. 245, this court recognized the *Barker* rationale. Previously in *State v. Kwitek* (1972), 53 Wis.2d 563, 571, 193 N.W.2d 682, this court held that if a specific period of time is to be adopted in determining speedy trial issues it must be done by the legislature and that a court would not ". . . fix such an arbitrary standard and base it upon judicial reasons."

In the instant case the period of time that elapsed from the arrest to the date of trial was twenty-two months. The length of this delay necessitates that we examine the reasons for the delay.

The delay in this case can be separated into three periods of time. The first from October 9, 1972, to the

first competency hearing on March 8, 1973, a period of five months; the second, from the first competency hearing on March 8, 1973, to the second competency hearing on March 19, 1974, a period of twelve months; the third, from the second competency hearing on March 19, 1974, to the August 26, 1974, date of trial, a period of five months.

█ In determining the reasons for a delay, an initial inquiry is, who caused the delay? If the delay can be attributed to the actions of the defendant, he cannot be heard to claim that that period of time be considered in deciding whether he has been denied a speedy trial. If the delay can be attributed to the state, then the state must justify the delay and to be a valid reason for delay it must be a delay that is intrinsic to the case itself. *Hadley, supra,* p. 362. If the state cannot justify the delay, then that period must be considered in deciding the issue of lack of speedy trial.

As to the first period of time, the complaint, initial appearance, preliminary hearing, arraignment and initial setting of the January 29, 1973, trial date, were all carried out expediently. The defendant complains about a six-day elapse between the information and the arraignment, but such a period can reasonably be attributed to the ordinary demands of the judicial system. Had the trial taken place on January 29, 1973, there would be no cause for a speedy trial claim.

On January 15, 1973, however, the defendant requested a physical and mental examination relative to his ability to stand trial. The three-month period before that request does not constitute delay. Pursuant to the defendant's request and upon the court finding that there was probable cause to believe that the defendant may be suffering from mental disease or defect, the defendant was sent to Central State Hospital for examination pursuant to ch. 971, Stats. The court explicitly set the time for examination at a maximum of sixty days. The ex-

amination was completed prior to that time; additional medical testimony was deemed necessary and was secured by the court; and the competency hearing was held on March 8, 1973, less than sixty days from January 15, 1973.

The two month delay initiated by the request for a mental examination cannot be attributed solely to the defendant. Upon a finding of probable cause to doubt the defendant's capacity to stand trial, the court is required by statute, sec. 971.14(1), (2), Stats., to take appropriate steps to resolve the question of competency. But even if that delay can be attributed to the state, it is a justifiable and valid delay. Nothing could be more intrinsic to a criminal case than a determination of the defendant's competency to participate in his own defense.

We are not here faced with situations like those cited by the defendant in *United States v. Calloway* (D.C. Cir. 1974), 505 Fed.2d 311, and *In re Harmon* (1st Cir. 1970), 425 Fed.2d 916. In those cases, the evaluation itself was duly delayed—In *Calloway,* for three months, and in *Harmon,* for one year. Here the question of the defendant's competency was raised only two weeks prior to trial. The examination and eventual competency hearing took place within two months. Such amount of time was not unreasonable, particularly in view of the specific provisions of ch. 971, Stats.

As to the second period of time, a period of twelve months elapsed. On March 8, 1973, the defendant was found incompetent to stand trial, was committed to Central State Hospital pursuant to sec. 971.14(5), Stats., and all proceedings were stayed until such time as the defendant was found competent to stand trial.

Under the holding of this court in *State ex rel. Matalik v. Schubert* (1973), 57 Wis.2d 315, 204 N.W.2d 13, a reexamination of the defendant's competency to stand trial was mandated after six months from the original commitment. On October 5, 1973, the defendant filed *pro se*

motions for dismissal for lack of speedy trial. The court set hearings on that issue and for receipt of further Central State Hospital reports for November 16, 1973. On that date, the state requested a continuance pending this court's decision in *State ex rel. Haskins v. Dodge County Court, supra.* The defendant did not object. On December 7, 1973, a further adjournment of the proceedings to January 15, 1974, was agreed to by all parties. The hearing was eventually held on March 19, 1974.

*Haskins* re-evaluated the six month re-examination criteria set up in *Matalik* and held that the ultimate retention of a defendant under sec. 971.14, Stats., should be limited not to six months but to eighteen months. *Haskins* applied to those cases such as the defendant's where individuals were still committed over the original six-month time period enunciated in *Matalik.* Thus, under the *Haskins* decision, the defendant was not entitled to discharge on September 9, 1974 (six months after original commitment) but was, up to and after that date, validly committed.

Regardless of the time periods for commitment and re-examination set up in *Matalik* and modified in *Haskins,* the following is clear: From the time of the original commitment on March 8, 1973, to the time of the March 19, 1974, competency hearing, the defendant was properly committed to Central State Hospital as incompetent to stand trial. If that delay is to be attributed to the state, then a valid reason exists for it. If the defendant was not competent to stand trial, no trial could be held. It is self evident that a delay caused by a defendant's incompetency to stand trial is intrinsic to the case itself.

The defendant was committed on March 8, 1973. The first indication that he had regained his competency occurred on March 5, 1974. The court, within two weeks after that date, held the competency re-examination. Of the twelve month delay caused by the commitment of

the defendant as incompetent to stand trial, at most, a total of approximately 15 days could be considered in determining whether the defendant was denied his right to a speedy trial.

As to the third period of time, a total of five months elapsed between the second competency hearing and the August 26, 1974, trial. During that time the defendant: Requested reassignment back to Judge L. J. FOLEY's court; made motions for bail reduction/modification; made a motion to suppress evidence, which motion required a *Goodchild* hearing; requested an adjournment of the suppression of evidence hearing as defense counsel was engaged in another trial; made a motion for further examination as to competency to stand trial; made a second request for reassignment; and made a request for the substitution of a judge. The defendant cannot be heard to complain about delay caused by his own conduct. The above requests on motions need not be called delaying tactics to be identified as time consuming impediments to an early trial. (*See McGrath v. State* (1969), 42 Wis.2d 292, 166 N.W.2d 172.)

It is our opinion that the state either inexplicably or without valid reason caused delay of the defendant's trial for the following periods of time. The seven day delay between the originally scheduled March 26, 1974, bail evaluation hearing and the actual April 1, 1974, hearing; the twenty day delay in reassigning the case after the defendant's May 10, 1974, request; and the forty day delay between the July 17, 1974, scheduled date for trial and the August 26, 1974, actual trial date.

Thus, summing up the three periods of time, at the maximum and under the most favorable considerations to the defendant, a total of less than six months could be considered as delay attributable to the state for the purposes of determining the merits of the defendant's assertion of his speedy trial right.

■ Under the facts of this case, the length of the delay does not constitute a delay which is prejudicial. Therefore, there is no necessity for inquiring into the other factors that go into the balancing test. *Foster v. State, supra,* p. 18; *Barker v. Wingo, supra,* p. 531.

## WAIVER OF JURY TRIAL.

Trial of the defendant before a jury was scheduled to commence on August 26, 1974. Prior to its commencement, defense counsel advised the court that the defendant was willing to waive jury trial and be tried before the court. After extensive questioning of the defendant by the court and the district attorney the court accepted the waiver and trial proceeded to the court.

Defendant now contends that his waiver of jury trial was not knowingly and intelligently made in that the defendant's mental condition, *i.e.,* almost no formal education, a measured IQ of 54, and a previous finding of incompetency, combined with the facts brought out by the court's extensive questioning, precludes finding such a waiver.

In two recent cases involving waiver of jury trial issues, *White v. State* (1970), 45 Wis.2d 672, 173 N.W.2d 649, and *Whitmore v. State* (1973), 56 Wis.2d 706, 203 N.W.2d 56, this court closely reviewed the record to determine whether the constitutional mandates and the statutory requirements for waiver were met.

The record in the instant case reflects that on March 19, 1974, defendant was declared competent to stand trial. His status as competent continued up to and through trial, and as a matter of fact, was brought to the attention of the court by defense counsel just prior to the defendant's signing the jury waiver.

The defendant appeared with his attorney who advised the court that defendant was willing to waive a jury trial and try the case before the court. Upon initial

questioning by the court, the defendant indicated that he had not really had time to think it over. Defense counsel stated, however, that he had discussed the matter with the defendant and that the defendant's hesitation came down to a ". . . [k]ind of fear of the situation, then lack of knowledge of what is going on or lack of understanding. I don't think he wants to meet the situation."

The court gave the defendant a choice—try the case before the court or a jury. The defendant stated that he would try it before the court.

The court questioned the defendant as to his understanding of the waiver. The defendant stated that he understood that his case could be tried before 12 men and women on a jury, and that they would be the ones who would decide whether or not he was guilty. At one point in the examination the defendant indicated he did not understand the explanation given by the court that the jurors' vote of guilty must be unanimous. Both defense counsel and the court further explained the requirements as to the jurors' vote in arriving at a verdict. The defendant then stated he wanted to be tried by the court.

In response to further questioning by the district attorney, the defendant indicated that no threats or promises were made to him by the district attorney and that he wanted the judge rather than the jury to hear the trial.

The trial court, based upon the statements of the defendant, accepted his jury waiver, and the defendant signed a written waiver by printing his name on it. After doing so, defense counsel had the defendant state on the record that although he could not read or write, he understood that he had signed a paper saying that he wanted the court rather than the jury to try his case.

After our review of the record we are not impressed with the argument of the defendant that the waiver of a jury trial was not made intelligently, deliberately and

voluntarily. The nature of the right which he was waiving was explained to him in depth and repeatedly. There is absolutely no evidence on the record of the existence of any mental impairment such as would negate a finding of an intelligent and voluntary waiver.

If the defendant intends to contend that as a matter of law his mental condition precludes the finding of intelligent waiver, that contention must fail.

Although his educational level and IQ are relatively low, he was found competent to participate in his own defense. This court in *Haskins, supra,* p. 265, cited *Dusky v. United States* (1960), 362 U.S. 402, 80 Sup. Ct. 788, 4 L. Ed.2d 824, as defining competency to stand trial:

" '[T]he "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." ' "

The defendant, having been found competent to stand trial, must necessarily have possessed the intellectual capacity to waive the right to a jury trial.

█ The record in this case leads to but one conclusion. The defendant knowingly and intelligently waived his right to a jury trial.

## ORAL STATEMENTS.

On October 7, 1972, after having turned himself in voluntarily to the police, the defendant orally admitted to the police that he had struck Johnson's car. He claimed that he had done so only once and only because he thought Johnson was getting a gun from his vehicle and the defendant wanted to stop him from doing so. On October 9, 1972, while in the custody of the police and in the presence of the assistant district attorney, the

defendant orally admitted that he had hit Johnson and his car three times in an attempt to kill him because Johnson had beat him up earlier that evening.

The state indicated its intention to use the above oral statements as evidence against the defendant. The defendant filed a pretrial motion to suppress the statements. On April 18, 1974, a combination *Miranda-Goodchild* hearing was held. The court held that both statements had been voluntarily made by the defendant after he had been fully advised of and waived his *Miranda* rights. The court denied the defense motion, and the testimony of Officer Wojak as to the content of the statements was admitted into evidence at trial.

The defendant now contends that the statements given in this case should not have been admissible because the circumstances under which they were given did not meet the requirements of *Miranda v. Arizona* (1966), 384 U.S. 436, 86 Sup. Ct. 1602, 16 L. Ed.2d 694; nor were they voluntarily given. In specific, the defendant contends that his own personal characteristics, *i.e.*, his own educational level, his IQ of 54, and the fact that only five months after giving the statements he was found incompetent to stand trial, all weigh heavily against a finding that he understood and intelligently waived his *Miranda* rights and against a finding that he voluntarily gave those statements.

█ Upon review of lower court proceedings involving *Miranda-Goodchild* hearings, this court will not upset the findings of fact and determination on the issues involved unless it appears that they are against the great weight and clear preponderance of the evidence. *Grennier v. State* (1975), 70 Wis.2d 204, 209, 234 N.W.2d 316; *Blaszke v. State* (1975), 69 Wis.2d 81, 86, 230 N.W. 2d 133; *Jones v. State* (1975), 69 Wis.2d 337, 343, 230 N.W.2d 677; *State v. Carter* (1966), 33 Wis.2d 80, 90, 91, 146 N. W.2d 466.

■ At a *Goodchild* hearing[2] the sole issue to be decided is the voluntariness of the statements and at a *Miranda-Goodchild* hearing the issues to be decided are the voluntariness of the statements, the proper giving of the *Miranda* warnings and the intelligent waiver of the *Miranda* rights. *State v. Hernandez* (1973), 61 Wis.2d 253, 259, 212 N.W.2d 118.

Since the trial court conducted a combination *Miranda-Goodchild* hearing, the findings of fact and determinations of the trial court on those three issues must be viewed in light of the evidence on record to determine if they are against the great weight and clear preponderance of such evidence.

Both Officer Schoner and Officer Wojak testified that the defendant had been read his *Miranda* rights before questioning him and that the defendant stated that he understood them. Both officers also testified as to their observations of the defendant's general appearance—he seemed calm and relaxed and they had no trouble communicating with him.

On the other hand, the defendant testified that he remembered talking to Officer Wojak on October 7, 1972, but that he did not remember being advised of constitutional rights and that he did not recall making a statement about hitting Johnson. He testified that he was injured at the time, although the officers testified that he appeared normal and had no injuries.

As to the October 9, 1972, statement, Officer Wojak testified that he gave the defendant the same rights he had given on October 7, 1972; that those rights were given both by himself prior to taking the defendant into the assistant district attorney's office, and by the assistant district attorney prior to questioning; that the defendant stated that he understood them; and that there

---

[2] *State ex rel. Goodchild v. Burke* (1965), 27 Wis.2d 244, 133 N.W.2d 753.

was no question in his mind that the defendant was mentally competent.

The defendant testified that he remembered going into the district attorney's office but that no one gave him his rights, told him he could have an attorney or told him he didn't have to say anything. He testified that Officer Wojak told him he could get an attorney after he talked to the district attorney. The defendant did not deny making any statement concerning the crime to the assistant district attorney.

■ The trial court's finding that the defendant did receive proper *Miranda* warnings and that he did make the two inculpatory statements was not against the great weight and clear preponderance of the evidence.

■ However, defendant also contends that he could not intelligently have waived his *Miranda* rights because his own mental capabilities prohibited him from fully understanding them; and not fully understanding them, he could not intelligently waive them. The trial court, based on the testimony of Officers Wojak and Schoner, held that the defendant did understand the rights. The trial court believed the officers and this court, on review, unless the greater weight and clear preponderance of the evidence dictates otherwise, cannot say that the trial court was in error. Credibility is an issue for the trier of fact. *State v. Schneidewind* (1970), 47 Wis.2d 110, 176 N.W.2d 303; *State v. Parker* (1972), 55 Wis.2d 131, 197 N.W.2d 742. Whether or not the defendant could intelligently waive those rights is in essence a question of voluntariness.

■ Even if made after receiving *Miranda* warnings, inculpatory statements made by defendant are inadmissible in a criminal prosecution against him unless they were made voluntarily. *McAdoo v. State* (1974), 65 Wis.2d 596, 223 N.W.2d 521; *State v. Parker, supra.* The state has the burden of proving voluntariness beyond a reasonable doubt. On review, the standard

is whether the findings of the trial court are contrary to the greater weight and clear preponderance of the evidence. Any conflicts in the testimony regarding the circumstances surrounding the statements must be resolved in favor of the trial court's findings. *McAdoo, supra; Schneidewind, supra; State v. Hoyt* (1964), 21 Wis.2d 310, 124 N.W.2d 47, *rehearing* (1964), 21 Wis.2d 284, 128 N.W.2d 645.

The defendant here contends that the statements could not have been voluntary because, in the totality of circumstances, his mental condition precluded a knowing, understanding and intelligent waiver of his *Miranda* rights. Similar contentions have been raised in the recent cases of *Grennier, supra; Blaszke, supra;* and *Schneidewind, supra.* The trial court in the *Goodchild* hearing found that the statements were voluntarily made.

■ To be admissible into evidence, an inculpatory statement must be the voluntary product of a free and unconstrained will, reflecting deliberateness of choice. *Pontow v. State* (1973), 58 Wis. 2d 135, 137, 205 N.W.2d 775. The question is whether it was obtained under such circumstances that it represents the uncoerced free will of the declarant or whether the circumstances deprived him of the ability to make a rational choice. *Roney v. State* (1969), 44 Wis.2d 522, 533, 171 N.W.2d 400.

■ Whether or not a statement is voluntary and not the result of coercion depends on the totality of circumstances surrounding the statement. *Grennier, supra,* 210; *McAdoo, supra,* 605; *Brown v. State* (1974), 64 Wis.2d 581, 585, 219 N.W.2d 373. A careful balancing must be made between the personal characteristics of the declarant and the pressures to which he was subjected in order to induce the statement. *State v. Wallace* (1973), 59 Wis.2d 66, 81, 207 N.W.2d 855.

In *Schneidewind, supra,* 117, this court set forth the relevant factors which must be considered on both sides of the balance:

". . . Courts must look to the 'totality of the circumstances' in determining whether a confession or admission can be called voluntary. A court must examine such factors as the age of the accused, *Haley v. Ohio* (1948), 332 U.S. 596, 68 Sup Ct. 302, 92 L. Ed. 224; the education and intelligence of the accused, *Townsend v. Sain* (1963), 372 U.S. 293, 83 Sup. Ct. 745, 9 L. Ed.2d 770; the conditions under which the interrogation took place, *Fay v. Noia* (1963), 372 U.S. 391, 83 Sup. Ct. 822, 9 L. Ed.2d 837; the physical and mental condition of the accused, *Blackburn v. Alabama* (1960), 361 U.S. 199, 80 Sup. Ct. 274, 4 L. Ed. 242; and any inducements, methods and stratagems which were used to persuade the accused to confess, *Lynumn v. Illinois* (1963), 372 U.S. 528, 83 Sup. Ct. 917, 9 L. Ed.2d 922; and what the responses were to his requests for counsel, *Haynes v. Washington* (1963), 373 U.S. 503, 83 Sup. Ct. 1336, 10 L. Ed.2d 513."

In addition to the evidence previously indicated, the record shows that the defendant voluntarily turned himself in after searching for the correct police station on October 7, 1972. Officers Schoner and Wojak testified that although he was advised of his constitutional rights, the defendant did not request an attorney; and that he was not threatened or promised anything before making a statement which verified all of the facts established by prior police investigation and which contained the inculpatory utterances. The statement closely followed the *Miranda* warnings. The interrogation was not lengthy. It took place in the booking room in the presence of Officers Wojak and Schoner and perhaps one other detective. There was nothing out of the ordinary in the configuration of the room, nor were any oppressive inducements, methods or stratagems utilized to induce the statement.

Officer Wojak testified that no promises or threats were made to the defendant prior to the statement given on October 9, 1972. On both October 7, when he turned himself in, and on October 9, when he went to the dis-

trict attorney's office, the defendant was accompanied by his wife and friends, although they were not present during the questioning. The defendant was visited by his wife in jail between October 7 and 9, 1972. The defendant testified that he was never threatened, but that he requested and was denied an attorney. The court was made aware of the defendant's educational level and mental condition.

On the basis of that evidence, and properly viewing the totality of the circumstances, the trial court found that the statements given were voluntary. This finding was not against the great weight and clear preponderance of the evidence.

The thrust of the defendant's argument is that *the* important factor in considering the totality of circumstances is the mental capacity of the declarant.

While the defendant's mental capacity was admittedly low, there was no convincing evidence presented at the *Goodchild* hearing that would indicate that the defendant's ability to waive his *Miranda* rights on October 7th and 9th was impaired. The evidence presented, on the issue of mental incompetency, was considerably less convincing than that presented in the cases cited for support by the defendant. *See Blackburn v. Alabama* (1960), 361 U.S. 199, 80 Sup. Ct. 274, 4 L. Ed.2d 242; *Commonwealth v. Jones* (Pa. 1974), 327 Atl.2d 10; *People v. Stanis* (1972), 41 Mich. App. 565, 200 N.W.2d 473.

Even though evidence of defendant's educational level, his IQ rating, and a finding of incompetence to stand trial five months after giving the statements, was presented, the main issue to be decided in a *Goodchild* hearing is voluntariness. Since the decision in *Goodchild, supra,* the question of the trustworthiness of a statement (*i.e.,* whether it is true and credible) has been left for the trier of fact after the statement has been received in evidence. *Hernandez, supra,* 259; *State v. Bergenthal*

(1970), 47 Wis. 2d 668, 678, 178 N.W.2d 16; *Roney, supra,* 532, 533.

The defendant's argument on this issue, while voiced in terms of voluntariness, is one mainly addressed to the trustworthiness of the statements. The totality of the circumstances leads us to conclude that the statements were made voluntarily. Whether they were trustworthy was for the trial court, as the trier of fact, to decide at the time of trial.

The inculpatory statements were properly admitted into evidence.

*By the Court.*—Judgment and order affirmed.

HEFFERNAN, J. (concurring) I concur in the court's mandate affirming the judgment and order appealed from. I agree that there was no denial of the constitutional right of speedy trial. I disagree, however, with the methodology utilized by the majority in making that determination.

In *State v. Ziegenhagen,* 73 Wis.2d 656, 245 N.W.2d 656, this court made clear that the balancing factors originally set forth in *Barker v. Wingo,* 407 U.S. 514 (1972), were not to be utilized unless the passage of time was presumptively prejudicial.

The period of time which triggers the presumption is unrelated to the factors utilized in the balancing test. A delay which on its face is inordinate or shocking to the court in terms of time elapsed before defendant is brought to trial, irrespective of the reason therefor, is in itself sufficient to compel the court to conclude that the delay was presumptively prejudicial.

Conversely, a court has no obligation to go into the reasons for delay if on the face of the record it appears that the delay, although unexplained, is not unreasonably long. Hence, the determination of whether a presumptively prejudicial delay has occurred has nothing to do with the reason for the delay. If the period of time

elapsed is unreasonably long, the delay is presumptively prejudicial even though weighing of the *Barker* factors may result in the determination that the delay was excusable because, as here, it resulted from circumstances intrinsic to the case.

In the instant case, the majority finds the delay of twenty-two months necessitates an examination of the reasons for the delay. This is a finding of presumptive prejudice. Yet, after considering the reasons for the delay, it concludes that the delay is not presumptively prejudicial. If the delay of twenty-two months was not presumptively prejudicial, then there need have been no inquiry into the reason for the delay.

I have no quarrel with the substance of what the court does. In reality, it finds the delay of twenty-two months presumptively prejudicial. This triggered its inquiry into the first of the balancing factors—reason for the delay. It properly concludes that the principal reason for the delay, the incompetency of the defendant to stand trial, was intrinsic to the case itself. That finding rebuts the presumption of prejudice, and the court concludes that the delay was caused by circumstances that did not infringe upon the defendant's constitutional right to a speedy trial. It was not obligated to proceed further with the balancing factors of *Barker*.

After going through that rationale, however, it is contrary to logic to then conclude that the delay was not presumptively prejudicial. What the court actually does is to find presumptive prejudice and then dispel it by the analysis of the facts. The presumption was rebutted, and it is contrary to any rational analysis for the court at that point to conclude that there was no presumption of prejudice. Were that true, no inquiry into the reasons for the delay would have been necessary or appropriate.

I am authorized to state that Justice ABRAHAMSON joins in this concurrence.